**United States District Court**
For the Northern District of California

**E-FILED on  5/10/12**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DANIEL DONOHUE, individually and on
behalf of all others similarly situated,

        Plaintiff,

        v.

APPLE, INC.,

        Defendants.

No. 11-cv-05337 RMW

ORDER GRANTING MOTION TO DISMISS

**[Re Docket No. 33]**

      Plaintiff Daniel Donohue ("plaintiff"), on behalf of himself and a class of similarly situated consumers, asserts claims against defendant Apple, Inc. ("Apple") related to a defect in the Apple iPhone that caused its "signal meter" to inaccurately reflect the strength of the device's cellular network connection.  Apple moves to dismiss the First Amended Complaint ("FAC") under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b).  For the reasons below, the court grants Apple's motion. With the exception of plaintiff's California law-based warranty claim and claim for restitution, which are dismissed with prejudice, the court dismisses all claims with thirty days' leave to amend.

**I. BACKGROUND**

**United States District Court**
For the Northern District of California

The Apple iPhone is a wireless "smartphone" that enables users to make phone calls, text message, email, check voicemail, use the internet, listen to music, watch videos and use software applications. FAC ¶ 15. The ability to use such features is contingent on the strength of the iPhone's connection to a wireless network, which varies depending on a user's location and other factors. *Id.* ¶ 16. Most cell phones, including the iPhone, contain a "signal meter" that informs the user of the strength of the phone's network connection. *Id.* ¶ 17.

**A.      The iPhone Signal Meter and User Guide**

The iPhone signal meter consists of a graphic showing one to five "bars." *Id.* The number of bars appearing at any given time purports to correspond to the strength of the phone's connection to the wireless network. *Id.* When the iPhone has no network connection, the bars are replaced with the phrase: "No Signal." *Id.* ¶ 21. The iPhone signal meter is "prominently" displayed in the upper left hand corner of the screen at virtually all times while the device is in use. *Id.* ¶ 18.

The iPhone "User Guide" is an instructional manual that describes the product's "capabilities, specifications and functionality." *Id.* ¶ 20. An online version of the User Guide "come[s] with the purchase" of an iPhone. *Id.* The User Guide "indicates that the signal meter … 'shows whether you're in range of the cellular network and can make and receive calls.'" *Id.* ¶ 21. For example, the User Guide instructs consumers who are having trouble making a phone call or accessing an internet website to "Check the cell signal icon in the status bar at the top of the screen. If there are no bars, or if it says 'No Service,' try moving to a different location. If you're indoors, try going outdoors or moving closer to a window." *Id.* ¶¶ 22-23.

**B.      Flaw in the iPhone Signal Meter**

Cell phone signal meters employ various formulas to calculate how many bars to display for a given signal strength. *Id.* ¶ 46. While some smartphone manufacturers incorporate formulas recommended by wireless network providers, Apple opted to use its own "secret" formula in its design of the iPhone signal meter. *Id.* ¶¶ 32, 45, 46. In developing this formula, Apple conducted testing in "anechoic chambers where no waves (sound or electromagnetic) can reflect off anything, so there is absolutely no interference." *Id.* ¶ 34. Apple concealed its use of this testing process, which "manifests an artificial environment for signal strength." *Id.* Apple also spent less time

United States District Court
For the Northern District of California

testing the iPhone than other smartphone vendors before releasing the product. *Id.* ¶ 33.  As a result of these alleged inadequacies, the formula underlying the iPhone signal meter was flawed, and often "misled consumers as to the quality of their connection by inflating the apparent strength-of-connection beyond the actual strength-of-connection." *Id.* ¶ 25.

On July 2, 2010, after receiving a "flurry of complaints" about the recently released iPhone 4, *id* ¶ 37, Apple issued a public letter addressed to "iPhone 4 Users" (the "July 2 Letter"). *See* Dkt. No. 31-1.  The July 2 letter indicated that "the formula we use to calculate how many bars of signal strength to display is totally wrong … For example, we sometimes display 4 bars when we should be displaying as few as 2 bars." *Id.*  The letter further acknowledged that the "mistake" had been present since the release of the original iPhone. *Id.*  "To fix this," the letter stated, "we are adopting [wireless provider] AT&T's recently recommended formula for calculating how many bars to display for a given signal strength." *Id.*  Apple assured consumers that a free software update incorporating the corrected formula would be available to users of the iPhone 4, iPhone 3GS and iPhone 3G "within a few weeks." *Id.*  Apple released the promised update on or about July 15, 2010.  FAC ¶ 45.

## C.    Plaintiff's iPhone Purchase and Related Harms

Plaintiff purchased an iPhone at an Apple retail store in Seattle, Washington in January 2010. *Id.* ¶ 51.  At the time of his purchase, the sample iPhone displayed at the store "appeared" to accurately represent signal strength. *Id.*  After his purchase, plaintiff used the iPhone signal meter to provide him with information about whether he could expect to rely on a signal when making or answering calls and using email or the internet. *Id.* ¶ 52.  He asserts that he experienced "dropped" calls that he did not expect to be dropped, and that he would have "refrained from making such calls or expected a higher likelihood of such calls being dropped if he had known that his connectivity was less that was apparent on the iPhone display." *Id.* ¶ 54.

According to plaintiff, the defective nature of the iPhone signal meter, which "substantially inflate[ed] customer perception of signal strength," would be "important to know [about] in deciding [whether] to purchase [an] iPhone or return it within 30 days after purchase," the period during which consumers can return the device for a full refund. *Id.* ¶¶ 60, 29.  Plaintiff claims that he had

been "seriously considering buying a competing phone before electing to purchase his iPhone," and that knowledge of the iPhone's signal meter flaw would have "materially affected" his decision to purchase the iPhone or return it within 30 days. *Id.* ¶ 60.  Plaintiff claims that his lack of knowledge was a consequence of Apple's failure to disclose information that the company knew, or reasonably should have known, would be of interest to potential iPhone purchasers. *Id*

Plaintiff also alleges that the value of an iPhone that inaccurately reports signal strength is less than the value of the same iPhone without the flaw. *Id.* ¶ 57.  In addition, plaintiff claims that the strength-of-signal flaw diminished the resale value of any iPhone purchased prior to July 14, 2010. *Id.* ¶ 61.  Finally, plaintiff notes that because the software update could only be installed on the iPhone 3G, 3GS and 4G models, consumers with older models were left "without a 'fix' for the signal strength flaw." *Id.* ¶ 50.[1]

**D.     Procedural Background and Class Allegations**

On November 3, 2011, plaintiff filed the instant action on behalf of (1) himself; (2) a class of "all persons who purchased an iPhone at retail in the United States at any time on or before July 14, 2010" (the "class"); and (3) a subclass of "all persons who purchased an iPhone at retail in the State of Washington at any time on or before July 14, 2010" (the "Washington subclass"). *Id.* ¶ 9.  The FAC, which forms the operative pleading for purposes of this motion, alleges claims for (1) breach of contract and the duty of good faith and fair dealing; (2) breach of implied warranty; (3) breach of express warranty; (4) violations of the Magnuson Moss Warranty Act ("MMWA"); (5) violations of Cal. Bus. & Prof. Code § 17200 ("UCL"); (6) violations of the Consumer Legal Remedies Act ("CLRA"); (6) violations of the Washington Consumer Protection Act ("WCPA"); and (7) restitution.

**II. DISCUSSION**

**A.     Standing**

**1.     Plaintiff's standing to bring claims on his own behalf**

---

[1]     It is not clear from the complaint or Apple's responsive briefing how many different iPhone models included the flawed signal meter.

**United States District Court**
For the Northern District of California

1     Apple first argues that plaintiff lacks standing to sue because the defective performance of

2   the iPhone signal meter did not cause him any cognizable injury.  In order to confer standing under

3   Article III of the federal constitution, a plaintiff's injury must constitute "an invasion of a legally

4   protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

5   conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal

6   citations and quotation marks omitted).  Injury is particularized if it affects the plaintiff in a

7   "personal and individualized way." *Id.* at 561 n. 1.  The injury may be minimal. *Preminger v.*

8   *Peake*, 552 F.3d 757, 763 (9th Cir. 2008).  When standing is challenged on the basis of the

9   pleadings, the court "accept[s] as true all material allegations of the complaint, and . . . construe[s]

10   the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

11     Standing to sue under the UCL requires plaintiff to demonstrate that he or she has personally

12   suffered "*economic* injury." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (Cal. 2011)

13   (emphasis added).  The requirement that injury be economic renders standing under the UCL

14   "substantially narrower than federal standing ... which may be predicated on a broader range of

15   injuries." *Id.* at 324.[2]  Economic injury may result from unfair competition if a plaintiff: (1)

16   surrenders in a transaction more, or acquires in a transaction less, than he or she otherwise would

17   have; (2) has a present or future property interest diminished; (3) is deprived of money or property to

18   which he or she has a cognizable claim; or (4) is required to enter into a transaction, costing money

19   or property, that would otherwise have been unnecessary. *Id.* at 323.

20     Apple contends that because the iPhone signal meter only "reports" the strength of the

21   network signal but does not affect the "actual signal strength, the iPhone's performance, or its call

22   quality," the signal meter cannot cause economic injury.  Dkt. No. 33 at 1.  Apple compares the

23   signal meter to a gauge on a car that displays ambient air temperature but has no impact on the

24   weather outside, and thus no real effect on the car's driver.  As Apple sees it, plaintiff's ability to use

25   his iPhone "was what it was ... irrespective of how the signal meter read." *Id.* at 7.

26

27   [2]     Apple does not argue that any *additional* injury is required for standing under the WCPA or
    CLRA.  The court will therefore infer that if plaintiff has standing to sue under the UCL, he has
28   standing to bring his other claims as well.

Plaintiff proposes a different automobile-related analog: the fuel gauge.  According to plaintiff, "in both cases, the consumer is directed to the readout to acquire information about the product's status and utility, information they need to use the product for the purpose for which they bought it."  Dkt. No. 40 at 3.  By plaintiff's logic, an iPhone with no network connection while the signal meter shows two bars is like a car that runs out of gas while the fuel gauge indicates that the tank is still forty percent full.  Therefore, he claims that his iPhone was less valuable as a result of the signal meter defect, and that he and the other class members suffered economic injury in the form of "lost money or property, including [the] reasonably calculated economic value of their iPhones."  *Id.* ¶ 133.

Although both analogies suffer shortcomings, the court finds plaintiff's arguments and cited authorities more persuasive.  A defective signal meter clearly has some impact on a user's experience with his iPhone—he might choose to make an important call based on the meter's readout only to have it inexplicably dropped or waste time moving from place to place in a quixotic search for "more bars."  Thus, even if the signal meter cannot *cause* a dropped call or a slow download, a consumer faced with the choice of whether to purchase an iPhone with an accurate signal meter or an inaccurate signal meter would unquestionably choose the former.  It is therefore reasonable to infer that a consumer who unknowingly buys an iPhone with a defective signal meter "acquires in a transaction less" than he or she would have absent the defect.  *Kwikset*, 51 Cal. 4th at 323.  Construing plaintiff's allegations in the most favorable light, Apple's admitted "mistake" caused economic injury by depriving plaintiff of the "benefit of the bargain" for which he paid.  *Kearney v. Hyundai Motor Co.*, No. 09-1298 DOC, 2010 U.S. Dist. LEXIS 68242, at *14 (C.D. Cal. June 4, 2010) (finding standing to bring diminution in value claims based on automobile airbag defects even when the alleged defects never materialized because "the loss was suffered at the moment of purchase"); *Trew v. Volvo Cars of N. Am.*, No. 05-1379 DFL PAN, 2006 U.S. Dist. LEXIS 4890 (E.D. Cal. Feb. 7, 2006) (claim that plaintiff would have paid less for a car had she known about a defect that could—but did not—cause her car to shake, surge or lose power was sufficient to confer standing).

United States District Court
For the Northern District of California

1   Apple's attempt to distinguish *Kearney* and *Trew* on the basis that those cases concern

2   "safety hazards" is unavailing.  While a product defect that causes a safety hazard is certainly more

3   likely to give rise to an actionable injury, neither the UCL nor Article III requires a plaintiff to show

4   that his health has been put at risk to get through the courthouse doors.  After all, injury for standing

5   purposes is not a question of degree or genre, but of concreteness.  *See Council of Ins. Agents &*

6   *Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (noting that "an identifiable trifle" is

7   sufficient for standing) (quoting *United States v. Students Challenging Regulatory Agency (SCRAP)*,

8   412 U.S. 669, 869 n. 14 (1973)).  Here, the diminution in the value of plaintiff's phone resulting

9   from the defect may be minor, but it is–at least in theory–calculable.[3]  Furthermore, because it is

10  undisputed that the signal meter failed to function properly at the moment of purchase, plaintiff's

11  injury is not "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560; *compare Briehl v. GMC*, 172

12  F.3d 623, 628 (8th Cir. 1999) (upholding dismissal of a product defect claim because "the Plaintiffs'

13  ABS brakes have functioned satisfactorily and at no time have the brakes exhibited a defect").

14  In addition, the California Supreme Court has clearly held that allegations of fraud and

15  misrepresentation may support diminution in value claims even where safety hazards are not at

16  issue.  *See Kwikset*, 51 Cal. 4th at 332 (false marking of locksets as "Made in the USA" conferred

17  standing to sue under Cal. Bus. & Prof. Code § 17200 because plaintiffs "bargained for locksets that

18  were made in the United States; they got ones that were not").  Here, plaintiff claims that "Apple

19  failed to disclose … at the time of sale, that the iPhone [signal meter] was unreliable, incorrect [or]

20  defective … [and] that it was designed to depict inflated signal strength."  FAC ¶ 149.  As in

21  *Kwikset*, Plaintiff alleges that knowledge of the undisclosed fact would have impacted his decision

22  to purchase his iPhone or return it within 30 days of purchase.  *Id.* ¶ 152; *see Kwikset*, 51 Cal. 4th at

23  327-28.  That *Kwikset* involved an affirmative misrepresentation on the product's label rather that an

---

24  [3]   The court remains extremely skeptical about plaintiff's ability to prove diminution in value
    damages, particularly for purchasers of the iPhone 3G, 3GS and 4G for whom Apple's software update
25  "fixed" the alleged defect.  However, as Apple has not raised this issue as an obstacle to standing, the
    court will assume as true plaintiff's allegation that he will be able to calculate diminution in value
26  damages for all class members.  *See Cole v. GMC*, 484 F.3d 717, 723 (5th Cir. 2007) ("Plaintiffs seek
    recovery for their actual economic harm (e.g., overpayment, loss in value, or loss of usefulness)
27  emanating from the loss of their benefit of the bargain … Whether recovery for such a claim is permitted
    under governing law is a separate question; it is sufficient for standing purposes that the plaintiffs seek
28  recovery for an economic harm that they allege they have suffered.").

1    omission of material fact is not dispositive of the standing inquiry; both may cause actionable injury

2    under certain circumstances.  *See, e.g.*, *Falk v. GMC*, 496 F. Supp. 2d 1088, 1098 (N.D. Cal. 2007)

3    (denying motion to dismiss claims under the CLRA and UCL based on defendant automaker's

4    failure to disclose known speedometer defect).  Accordingly, the court finds that plaintiff's

5    allegations establish an injury sufficient for standing under both the UCL and Article III.

6            The FAC also satisfies the requirement that plaintiff show that Apple caused the injury in

7    question.  In establishing causation in the context of a consumer protection claim, "it is not …

8    necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation [or

9    omission] be the sole or even the predominant or decisive factor in influencing his conduct. … It is

10   enough that the representation has played a substantial part, and so has been a substantial factor, in

11   influencing his decision.  Moreover, a presumption, or at least an inference, of reliance arises

12   wherever there is a showing that a misrepresentation was material."  *In re Tobacco II Cases*, 46 Cal.

13   4th 298, 326-327 (Cal. 2009).  Here, plaintiff asserts that "had he known these material facts [about

14   the signal meter defect] he would have considered purchasing a different mobile phone and/or

15   asking for a timely refund."  FAC ¶ 168.  The court finds this allegation both plausible and enough

16   to show causation for standing purposes.  Consequently, the court rejects Apple's argument that

17   plaintiff lacks standing to sue on his own behalf.

18           **2.      Plaintiff's standing to bring claims on behalf of purchasers of iPhone models
                          that he did not purchase**

19

20           While the FAC does not specify which iPhone model plaintiff purchased in January 2010, he

21   concedes that he has only ever owned two models.  *See* FAC ¶ 51.  Apple contends, and plaintiff

22   does not dispute, that based on the timing of his purchase, he did not buy the iPhone 4.  Apple

23   argues that plaintiff therefore lacks standing to bring claims on behalf of purchasers of that product

24   and other models he has never owned.  *See* Dkt. No. 33 at 8.  In response, plaintiff contends that

25   Apple's argument concerns not standing but the dimensions of the putative class, and should be

26   addressed on a motion for class certification.

27           Courts in this circuit have diverged on the question of whether a named plaintiff has standing

28   to sue on behalf of purchasers of a product that he or she did not purchase.  *Compare Johns v. Bayer

     Corp.*, No. 09-1935 DMS, 2010 U.S. Dist. LEXIS 10926, at *12-13 (S.D. Cal. Feb. 9, 2010)

ORDER GRANTING MOTION TO DISMISS
No. 11-cv-05337 RMW
EDM                                                      8

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

(purchaser of one vitamin product lacks standing to sue on behalf of purchasers of a different vitamin product made by the same defendant under the UCL or CLRA); *Carrea v. Dreyer's Grand Ice Cream, Inc.*, No. 10-1044 JSW, 2011 U.S. Dist. LEXIS 6371 (N.D. Cal. Jan. 10, 2011) (same) *with Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1134 (W.D. Wash. 2010) (allowing named plaintiffs to sue over misrepresentations regarding computer models they did not purchase because all claims involved the "same core factual allegations and causes of actions"); *Bruno v. Quten Research Inst., LLC*, No. 11-173 DOC, 2011 U.S. Dist. LEXIS 132323, at *10 (C.D. Cal. Nov. 14, 2011) (granting named plaintiff standing to sue on behalf of purchasers of related products and finding that "treatises and the vast majority of persuasive authority" indicate that this issue should be analyzed under Rule 23 rather than as a standing question).  Apple, however, contends that the "more recent authority" supports denying standing for a non-purchaser under California unfair competition law.  The case upon which Apple relies, *Mlejnecky v. Olympus Imaging Am., Inc.*, No. 10-2630 JAM, 2011 U.S. Dist. LEXIS 42333 (E.D. Cal. Apr. 18, 2011), cited *Kwikset* for the proposition that because the named plaintiff could not claim "economic injury" from misrepresentations about products she did not buy, she lacked standing to sue on behalf of purchasers of such products.  *See id.*, at *12.

This court respectfully disagrees with *Mlejnecky*'s characterization of *Kwikset*, and finds that plaintiff has standing to assert claims on behalf of purchasers of other iPhone models.  While *Kwikset* clarified the economic injury requirement for standing under the UCL, it did not purport to address whether a plaintiff who has suffered such an injury could represent a class of individuals who purchased distinct but similar products.  Indeed, shortly before issuing its decision in *Kwikset*, the California Supreme Court explained that "representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation."  *In re Tobacco II Cases*, 46 Cal. 4th at 319 (internal citations omitted); *see also Bruno*, 2011 U.S. Dist. LEXIS 132323, at *10.  The *Kwikset* court relied heavily on the reasoning of its *In re Tobacco II* decision, and made no reference to overruling or modifying its earlier holding.

United States District Court
For the Northern District of California

1  Furthermore, unlike in *Johns*, plaintiff here does not allege injury based solely on Apple's

2  alleged misrepresentations, but on the diminution in value resulting from the product defect itself,

3  which Apple has already admitted existed in every iPhone model at issue in this case.  Thus, "if

4  certification is granted, the proposed class would contain plaintiffs who have personal standing to

5  raise [the] claims [advanced by plaintiff]."  *In re Buspirone Patent & Antitrust Litig.*, 185 F. Supp.

6  2d 363, 377 (S.D.N.Y. 2002).  In this context, the court concludes that Apple's arguments boil down

7  to questions of whether common issues predominate and whether plaintiff can adequately represent

8  absent class members, issues that are better resolved at the class certification stage.  The court thus

9  concludes that plaintiff has standing to bring claims on behalf of the proposed class and subclass.

10  **B.     Assertion of Claims under California Law Arising from a Washington-Based
        Transaction**

11

12  Apple next argues that under *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012),

13  plaintiff cannot assert California law-based claims because he both resides and purchased his iPhone

14  in Washington State.  In *Mazza*, the plaintiffs alleged that a car company made various

15  misrepresentations in marketing campaigns regarding a technology package in its cars.  The

16  plaintiffs brought claims under four California causes of action: (1) UCL; (2) FAL; (3) CLRA; and

17  (3) unjust enrichment.  *Mazza*, 666 F.3d at 587.  After certification of a nationwide class by the trial

18  court, the Ninth Circuit considered briefing from the defendant that "exhaustively detailed the ways

19  in which California law differs from the laws of the 43 other jurisdictions."  *Id.* at 591.  After

20  applying an in-depth choice-of-law analysis, the Court of Appeal vacated the class certification

21  order, finding that "[u]nder the facts and circumstances of this case, we hold that each class

22  member's consumer protection claim should be governed by the consumer protection laws of the

    jurisdiction in which the transaction took place."  *Id.* at 594.

23

24  Although *Mazza* may influence the decision whether to certify the proposed class and

25  subclass, such a determination is premature.  At this stage in the litigation—before the parties have

26  submitted briefing regarding either choice-of-law or class certification—plaintiff is permitted to

    assert claims under the laws of different states in the alternative.  *See, e.g.*, *In re Sony Grand WEGA*

27  *KDF-E A10/A20 Series Rear Projection HDTV TV Litig.*, 758 F. Supp. 2d 1077, 1096 (S.D. Cal.

28  2010) ("In a putative class action, the Court will not conduct a detailed choice-of-law analysis

1   during the pleading stage.").  Moreover, while plaintiff does point to several differences between

2   Washington and California law in his opposition motion, more is needed for Apple to sustain its

3   burden to show that those differences are "'material,' that is, … they 'make a difference in this

4   litigation.'"  *Bruno v. Eckhart Corp.*, No. 11-0173 DOC, 2012 U.S. Dist. LEXIS 30873, at *24 (C.D.

5   Cal. Mar. 6, 2012) (declining to reconsider a class certification order in light of *Mazza*) (quoting

6   *Mazza*, 666 F.3d at 590-91).  The court therefore declines to dismiss plaintiff's California law-based

7   claims under *Mazza*.

8   **C.   Fraud-Based Claims**

9        Apple's third contention is that plaintiff's fraud-based "consumer protection

10  claims"—specifically, his claims under the UCL, CLRA and WCPA—must be dismissed for failure

11  to comply with Fed. R. Civ. P. 9(b).

12       Rule 9(b) requires that when fraud is alleged, "a party must state with particularity the

13  circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  If fraud is not an essential element of a

14  claim, "only those allegations of a complaint which aver fraud are subject to Rule 9(b)'s heightened

15  pleading standard."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citing *Vess v.*

16  *Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  However, where claims allege a

17  "unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that

18  claim, …the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a

19  whole must satisfy the particularity requirement of Rule 9(b)."  *Kearns*, 567 F.3d at 1126 (applying

20  Rule 9(b) standard to uphold dismissal of UCL and CLRA claims that Ford Motor Company and its

21  "co-conspirator" dealerships knowingly misrepresented to the public that certain vehicles were

22  "safer and more reliable").  A complaint meets this standard if it alleges "'the time, place, and

23  content of the alleged fraudulent misrepresentation or omission; the identity of the person engaged

24  in the fraud; and the circumstances indicating falseness' or 'the manner in which [the] representations

25  [or omissions] were false and misleading.'"  *Genna v. Digital Link Corp.*, 25 F. Supp. 2d 1032, 1038

26  (N.D. Cal. 1997) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1547-58 n. 7 (9th Cir. 1994)).

27       The parties do not seriously dispute whether claims based on Apple's alleged

28  misrepresentations or omissions concerning the performance of the iPhone signal meter are subject

1    to the requirements of Rule 9(b).[4]  The court therefore considers whether each of plaintiff's

2    allegations can satisfy that standard.

3        **1.    Affirmative misrepresentation claims**

4        A plaintiff asserting causes of action for fraudulent misrepresentation under the UCL, CLRA

5    or WPCA must allege that he was exposed to a particular representation that is claimed to be

6    deceptive.  *See, e.g.*, *Baltazar v. Apple, Inc.*, 2011 U.S. Dist. LEXIS 13187, at *10-11 (N.D. Cal.

7    Feb. 10, 2011); *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1188 (W.D. Wash. 2010).

8    The plaintiff must also allege the "specifics" of his reliance upon such misrepresentations.  *Baltazar*,

9    2011 U.S. Dist. LEXIS 13187, at *10; *Minnick*, 683 F. Supp. 2d at 1188.

10       Plaintiff contends that his misrepresentation claim is "not predicated on written

11   misrepresentations," but rather on the fact that his iPhone and the iPhone displayed at the Apple

12   store at the time of his purchase "appeared to work and represent signal strength properly even

13   though it was misrepresenting the signal strength via depictions of the number of bars on the [signal

14   meter]."  Dkt. No. 40 at 8; FAC ¶ 147.  Plaintiff argues that "nothing in the UCL, CLRA or WPCA

15   appears to preclude visual misrepresentations, which can underpin claims of deceptive conduct."

16   Dkt. No. 40 at 8.

17       Plaintiff overstates the scope of the consumer protection laws at issue.  While it is true that

18   such statutes prohibit the promulgation of misleading "statement[s] or *representation[s]*," *Goldsmith*

19   *v. Allergan, Inc.*, No. 09-7088 PSG, 2011 U.S. Dist. LEXIS 80998, at *10 (C.D. Cal. May 25, 2011)

20   (emphasis added), plaintiff cites no case holding that a "representation" conveyed by a product's

21   appearance *alone* can give rise to liability for fraud.  *Compare id.* (oral misrepresentations made by

22   defendant's sales representative during visits to plaintiff's office); *FTC v. Cyberspace.com, LLC*, 453

23   F.3d 1196, 1200 (9th Cir. 2006) (checks mailed to plaintiffs containing language that created the

24   deceptive impression that the mailings were refunds or rebates rather than an offer for services);

---

25   [4]    Plaintiff contends that under *Faigman v. AT&T Mobility LLC*, No. 06-04622 MHP, 2007 U.S.
     Dist. LEXIS 52192 (N.D. Cal. July 17, 2007), certain claims are subject to an "intermediate standard"
26   which only requires a pleading to include "some specificity … to put defendants on notice of the charges
     leveled against them."  *Id.*, at *11 (quoting *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1097-98
27   (N.D. Cal. 2006)).  However, as both *Faigman* and *Nordberg* preceded *Kearns*, which clearly held that
     Rule 9(b) applies to claims alleging a "unified course of fraudulent conduct" under the UCL and CLRA,
28   the court finds that to the extent that *Faigman* articulates a lower standard, it is inapplicable here.

**United States District Court**
For the Northern District of California

*Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 894 (Wash. 2009) (notices mailed to plaintiffs whose language *and* appearance were falsely representative of debt collection notices).  Under plaintiff's argument, if a car's dashboard clock were fast or its temperature gauge miscalibrated, the manufacturer would have engaged in an actionable misrepresentation.  The court does not understand the UCL, CLRA or WCPA to reach so far, and thus declines to find that the "representations" alleged can give rise to liability under those statutes.

Furthermore, plaintiff's allegations regarding the "sample iPhone display at the Apple store" fail to meet the requirements of Rule 9(b).  *See* FAC ¶ 147.  Plaintiff does not indicate what the signal meter on the display depicted; he alleges only that the signal meter "appeared … to work ... properly."  *Id.*  Nor does plaintiff allege that he relied on the information conveyed by the display's signal meter in making his purchase.  Such allegations are insufficient to support a claim for fraudulent misrepresentation.  *See Kearns*, 567 F.3d at 1126 ("Nowhere in the TAC does Kearns specify what the television advertisements or other sales material specifically stated …. Kearns also failed to specify which sales material he relied upon in making his decision to buy a CPO vehicle.").  Thus, even if a product displayed at a retail store that falsely appeared to function properly could constitute a "misrepresentation," the FAC does not include enough detail to support plaintiff's claims.

Accordingly, the court grants Apple's motion to dismiss claims under the UCL, CLRA and WCPA based on alleged affirmative misrepresentations.  As plaintiff may be able to identify an affirmative misrepresentation concerning the iPhone signal meter, dismissal is granted with leave to amend.

**2.    Omission claims**

To be actionable, an omission must be "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose."  *Baltazar*, 2011 U.S. Dist. LEXIS 13187, at *11 (quoting *Daugherty v. American Honda Motor Co. Inc.*, 144 Cal. App. 4th 824, 835 (Cal. Ct. App. 2006)).  A duty to disclose may arise: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the

United States District Court
For the Northern District of California

1    plaintiff; or (4) when the defendant makes partial representations but also suppresses some material

2    fact. *Falk v. GMC*, 496 F. Supp. 2d 1088, 1094-1095 (N.D. Cal. 2007) (citing *LiMandri v. Judkins*,

3    52 Cal. App. 4th 326, 337 (Cal. Ct. App. 1997)).  As the Ninth Circuit has recently cautioned, in the

4    context of product defect claims, "California courts have generally rejected a broad obligation to

5    disclose." *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012).[5]

6         Here, plaintiff claims that Apple failed to disclose on the "product packaging, via point of

7    sale literature, at Apple retail stores, and otherwise … that the iPhone [signal meter] was unreliable,

8    incorrect, defective, and … that it was based on a faulty, an unverified and/or inflated formula, [and]

9    that it was designed to depict inflated signal strength."  FAC ¶¶ 148-49.  Apple does not appear to

10   dispute that the defect in the iPhone signal meter is material; that is, "had the omitted information

11   been disclosed, one would have been aware of it and behaved differently."  *Falk*, 496 F. Supp. 2d at

12   1095 (internal citations omitted).  Further, as discussed above, the court finds that Apple did not

13   make any affirmative representations concerning the performance of the signal meter.  Therefore,

14   the inquiry turns primarily on whether Apple had a duty to disclose the defect to iPhone purchasers.

15              **a.    Duty to disclose**

16        Plaintiff argues that his allegations are sufficient to meet both the "exclusive knowledge" and

17   "active concealment" requirements to trigger a duty to disclose.  Plaintiff points to assertions that

18   Apple conducted its signal meter testing and development in "secret," FAC ¶ 32, and that "Apple

19   was solely in control and responsible for determining what the [signal meter] would display, how it

20   worked, and what customers were told about how to use it."  FAC ¶ 70.  He also alleges that "unlike

21   makers of other cell phones, Apple programmed its iPhones so as to prevent users from tampering

22   with the hardware and/or software, which further inhibited Plaintiff and the Class from learning

23   about the … defect."  *Id.* ¶ 44.

24        Apple first responds that it did not conceal "exclusive" knowledge because "if plaintiff

25   experienced issues with his iPhone's … reception … he knew it; the signal meter could not disguise

26   ────────────

[5]    The *Wilson* court further noted that courts have generally held that "[a] manufacturer's duty to

27   consumers is limited to its warranty obligations absent either an affirmative misrepresentation or a safety
     issue."  *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1142 (9th Cir. Cal. 2012) (internal citations

28   omitted).  However, as neither party has addressed whether the signal meter defect raises a "safety issue"
     and Apple has not moved to dismiss on this ground, the court will not consider this limitation here.

1    his actual experience." Dkt. No. 43 at 14.  But while plaintiff may have known that he was having

2    reception problems, it does not follow that he knew his iPhone's signal meter was defective.  Unlike

3    the driver of a car with a defective ambient temperature gauge who can put his hand outside the

4    window to determine what the weather is like, a cell phone user has no way to ascertain the "true"

5    strength of his network connection and deduce that his signal meter is inaccurate.  Moreover,

6    plaintiff specifically alleges that because Apple effectively prevented consumers from "tampering

7    with" iPhone software, they could not have discovered the signal meter's latent flaw.  Plaintiff's

8    allegations thus demonstrate that Apple "was in a superior position to know" about the defect.  *Falk*,

9    496 F. Supp. 2d at 1096.

10          Apple next relies on a series of cases rejecting duty to disclose claims based on product

11   defects that manifested themselves after the expiration of a manufacturer's express warranty.  *See*

12   *Wilson*, 668 F.3d 1136; *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964 (N.D. Cal. 2008); *Vitt*

13   *v. Apple Computer, Inc.*, No. 10-55941, 2012 U.S. App. LEXIS 4419 (9th Cir. Cal. Feb. 28, 2012);

14   *Hovsepian v. Apple, Inc.*, No. 08-5788 JF, 2009 U.S. Dist. LEXIS 117562 (N.D. Cal. Dec. 17,

15   2009).  For example, in *Oestreicher*, the plaintiff purchased a laptop computer with a three-month

16   warranty.  After six months, the laptop stopped working, and the plaintiff brought claims based on

17   the manufacturer's alleged knowledge of a design defect related to the computer's heat management

18   system.  The court dismissed the plaintiff's complaint, finding that the "failure of a product to last

19   forever" is not a "defect," and that "a contrary holding would eliminate term limits on warranties,

20   effectively making them perpetual or at least for the 'useful life' of the product."  *Oestreicher*, 544 F.

21   Supp. 2d at 972 (citing *Daugherty*, 144 Cal. App. 4th at 829).

22          By contrast, plaintiff here alleges that his iPhone failed to perform as expected from the

23   moment he purchased it.  This case therefore does not raise similar policy concerns regarding

24   potential conflicts between a manufacturer's right to limit its liability under warranty and its duty to

25   disclose known defects.  Consequently, the court finds Apple's cited authorities materially

26   distinguishable.  *See Baba v. Hewlett-Packard Co.*, No. 09-05946 RS, 2010 U.S. Dist. LEXIS

27   59747, at *9-10 (N.D. Cal. June 16, 2010) (finding *Oestreicher* and its progeny inapposite because

28

1   they "involved alleged defects that had manifested themselves after expiration of the warranty

2   period").

3           Finally, Apple argues that plaintiff has failed provide more than "bare legal conclusions"

4   regarding Apple's knowledge of the signal meter's flaw.  Dkt. No. 33 at 14 n. 7.  In order to give rise

5   to a duty to disclose, a complaint must contain specific allegations demonstrating the manufacturer's

6   knowledge of the alleged defect *at the time of sale*.  *See Baba*, 2010 U.S. Dist. LEXIS 59747, at

7   *14-15 (finding allegations that HP knew of a purported defect based on "numerous complaints" and

8   internet postings insufficient to show knowledge at the time of sale because "none of [the] postings

9   or complaints … include any dates, and therefore shed no light on when HP knew of the alleged

10  defects").

11          Whether plaintiff has demonstrated that Apple knew of the alleged defect when he purchased

12  his iPhone in January 2010 is a close question.  On one hand, Apple publicly acknowledged in the

13  July 2 letter that "the mistake has been present since the original iPhone."  Dkt. No. 31-1.  Plaintiff

14  asserts that the meter was specifically designed to overstate signal strength in order to give Apple a

15  competitive advantage.  *See* FAC ¶ 71-72.  It could therefore be inferred that Apple knew of the

16  signal meter defect before July 2010, and disclosed the flaw at that time only because the

17  widespread reports of reception problems had begun to hurt sales.  On the other hand, the FAC and

18  the July 2 letter both indicate that Apple's investigation into potential problems with the iPhone

19  signal meter was initiated in response to complaints about *the iPhone 4*, which was not released until

20  after plaintiff's purchase.  *See* FAC ¶ 33; Dkt. No. 33-1.  Plaintiff points to no complaints, data or

21  other information about pre-iPhone 4 models that would have put Apple on notice that such models

22  were similarly defective.  *Compare Falk*, 496 F. Supp. 2d at 1096-97 (finding evidence of exclusive

23  knowledge where plaintiffs cited numerous complaints about allegedly defective speedometers filed

24  during the time period in question, as well as the fact that dealers had provided General Motors with

25  testing data about the speedometers before the products were sold to the plaintiffs).  Plaintiff's

26  allegation that Apple "knew of the defect long before the disclosure" is thus contradicted by the only

27  factual assertions currently before the court.  FAC ¶ 72.  Because plaintiff has not sufficiently

28  established that Apple knew of the alleged defect in *his* iPhone at the time of purchase, the court

1  grants the motion to dismiss plaintiff's duty to disclose claims under the UCL, CLRA and WCPA

2  with leave to amend.

3  **D.      Non-Fraud Based UCL Claims**

4          In addition to fraud-based claims, plaintiff asserts claims under the "unfair" prong of the

5  UCL based on Apple's "substandard and insufficient" design and testing of the iPhone signal meter.

6  FAC ¶ 140.  "California courts have not yet determined how to define 'unfair' in the consumer action

7  context."  *Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 736 (9th Cir. 2007).  In *Cel-Tech*

8  *Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal. 4th 163, 186 (Cal. 1999), the California

9  Supreme Court held that in suits between competitors, unfairness must "be tethered to some

10  legislatively declared policy or proof of some actual or threatened impact on competition."  In the

11  wake of *Cel-Tech*, some California courts of appeal considering consumer suits have applied the

12  pre-*Cel-Tech* balancing test, which prohibits conduct that is "immoral, unethical, oppressive or

13  unscrupulous and causes injury to consumers which outweighs its benefits."  *McKell v. Washington*

14  *Mutual, Inc.*, 142 Cal. App. 4th 1457, 1473 (Cal. Ct. App. 2006).  Other courts have applied the

15  three-pronged test contained in the Federal Trade Commission Act, 15 U.S.C. § 45(a), which finds a

16  practice unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits

17  to consumers or to competition, and is not an injury the consumers themselves could reasonably

18  have avoided.  *See Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394 (Cal. Ct. App. 2006).

19  This test focuses more on the balance between consumer injury and the utility of a defendant's

20  conduct than whether a business practice is "deceptive or sharp."  *S. Bay Chevrolet v. GM*

21  *Acceptance Corp.*, 72 Cal. App. 4th 861, 887 (Cal. Ct. App. 1999).  While both tests have been cited

22  by numerous state a federal courts in recent years, the Ninth Circuit has rejected the viability of the

23  *Camacho* standard "in the absence of a clear holding from the California Supreme Court."  *Lozano*,

24  504 F.3d at 736.  This court therefore applies the balancing test articulated in *McKell*.

25          Here, it is hard to see how Apple's choice to develop its own formula in designing the iPhone

26  signal meter could be characterized as "immoral, unethical, oppressive or unscrupulous."  Many of

27  Silicon Valley's greatest innovations have resulted from decisions to reject the status quo in favor of

28  new approaches to old problems.  Without any facts supporting plaintiff's conclusory claim that

1  Apple *knowingly* or *purposefully* designed the iPhone signal meter to artificially inflate apparent

2  signal strength, the court is loath to pass judgment on a design decision that is clear only in hindsight

3  to have been a mistake.  Indeed, as plaintiff cites no authority finding that a product design alone can

4  constitute unfair conduct without related misrepresentations or omissions, the court is not even

5  certain that the UCL is applicable to the allegations at hand.  In addition, while plaintiff claims that

6  Apple's conduct was "contrary to industry standards," it cites no specific evidence—such as the

7  testing processes or formulas used by other smartphone vendors—supporting this proposition.

8  Accordingly, the court grants Apple's motion to dismiss plaintiff's claims under the "unfair" prong of

9  the UCL with leave to amend.

10  **E.      Warranty Claims**

11       **1.      Pre-suit notice**

12         Plaintiff's breach of express warranty claim is based on the allegation that the User Guide

13  falsely promised that the signal meter would accurately depict signal strength.  *See* FAC ¶ 112.  His

14  implied warranty claim alleges that "faulty signal meters rendered [class members'] phones unfit for

15  ordinary use."  FAC ¶ 107.  Plaintiff also asserts a claim under the federal Magnuson Moss Warranty

16  Act ("MMWA"), 15 U.S.C. §§ 2301-12, based on the same alleged breaches.  FAC ¶ 124.

17         Apple argues that each of plaintiff's warranty claims must be dismissed because he did not

18  provide notice of the alleged breaches until December 5, 2011, more than one month after the filing

19  of plaintiff's original complaint.[6]  *See* Dkt. No. 34-1, Ex. C.  Because the court finds that plaintiff's

20  failure to give pre-suit notice bars his warranty claims under California, Washington and federal law,

21  the court does not address the questions of whether the User Guide can give rise to warranty

22  obligations or whether plaintiff's allegations meet the substantive elements required to state express

23  or implied warranty claims at this time.

24         **a.      Warranty claims asserted under California law**

_____

25    [6]      Plaintiff does not plead the exact date upon which notice was given.  However, he alleges that
he notified Apple orally and in writing within a reasonable time after discovering the breach.  FAC ¶

26  117.  The court therefore takes judicial notice of the date of plaintiff's notification letter submitted by
Apple under the incorporation by reference doctrine.  *See Dunn v. Castro*, 621 F.3d 1196, 1205 n. 6 (9th

27  Cir. 2010) ("Under the 'incorporation by reference' doctrine, we may consider documents whose
contents are alleged in a complaint and whose authenticity no party questions, but which are not

28  physically attached to the [plaintiff's] pleading.") (internal citation and quotation marks omitted).

To avoid dismissal of a breach of warranty claim in California, "[a] buyer must plead that notice of the alleged breach was provided to the seller within a reasonable time after discovery of the breach." *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) (internal citations omitted); *see also* Cal. Com. Code § 2607(3)(A) ("The buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy[.]"). The purpose of the notice requirement is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court. *See Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135 (Cal. Ct. App. 2008). The Ninth Circuit has therefore construed Cal. Com. Code § 2607(3)(A) to require the plaintiff to show that he has given the seller notice of the breach before filing suit. *See Alvarez*, 656 F.3d at 932 (upholding dismissal of express and implied warranty claims with prejudice where the undisputed evidence established that the plaintiffs sent a notice letter simultaneously with the complaint).

Plaintiff contends that *Alvarez* is inapplicable here because while he did not provide notice before filing suit, Apple was notified of its alleged breach before he filed his *amended* complaint, in which he asserted warranty claims for the first time. Plaintiff argues that barring his claims under these circumstances would preclude aggrieved parties from bringing warranty claims based on facts identified after the filing of an initial complaint. He further implies that dismissing claims asserted for the first time in an amended complaint would frustrate the purposes of Fed. R. Civ. P. 15, which provides for the filing of amended and supplemental pleadings.

Although plaintiff's position has some appeal, it is unavailing here. First, the *Alvarez* court rejected a similar argument by expressly overruling *Hampton v. Gebhardt's Chili Powder Co.*, 294 F.2d 172, 173-74 (9th Cir. 1961), which had concluded that a warranty claim could proceed although the plaintiff did not allege she had provided notice until filing a supplemental pleading more than six months after first filing suit. *See Alvarez*, 656 F.3d at 932. Second, plaintiff has not indicated that his warranty claims are based on facts discovered after he first filed suit. Indeed, by the time plaintiff sent notice to Apple, he was already litigating substantially similar claims based on the same facts that underlie his warranty claims. *See* Dkt. No. 1. Given this posture, allowing plaintiff to assert a warranty claim without first giving notice would completely eliminate Apple's

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    "opportunity to repair the defective item" or "negotiate [a] settlement" before the initiation of

2    litigation. *Cardinal Health 301, Inc.*, 169 Cal. App. 4th at 135. It would also invite gamesmanship

3    by plaintiffs who know they intend to assert a warranty claim but want to avoid giving a defendant

4    notice before filing suit. The court thus grants the motion to dismiss plaintiff's breach of express and

5    implied warranty claims under California law. Because there appears to be no dispute as to whether

6    plaintiff gave Apple pre-suit notice of its alleged breach or whether plaintiff had knowledge of the

7    facts supporting his warranty claims before filing his original complaint, dismissal of this claim is

8    with prejudice.

9               **b.        Warranty claims asserted under Washington law**

10              Washington law similarly requires a plaintiff asserting a claim for breach of warranty to

11   plead that notice has been given within a "reasonable time" after discovering the alleged breach. *See*

12   Rev. Code Wash. § 62A.2-607; *Kasey v. Suburban Gas Heat*, 60 Wn.2d 468, 474 (Wash. 1962).

13   Plaintiff claims that Washington courts "liberally construe" this provision, implying that his

14   warranty claim under Washington law should survive even if his California law-based claim is

15   dismissed. Dkt. No. 40 at 20. However, plaintiff cites no authority considering whether Washington

16   law requires pre-suit notice of an alleged breach, and the court has found none. Given that plaintiff

17   plainly had notice of the purported breach of the "warranties" expressed in the User Guide before

18   filing suit but did not inform Apple of his intention to file a warranty claim until more than a month

19   later, the court finds as matter of law that plaintiff failed comply with the requirements of Rev. Code

20   Wash. § 62A.2-607. *See Bleyhl v. Tea Garden Prods. Co.*, 30 Wn.2d 447, 458 (Wash. 1948) ("In

21   some cases the undisputed factual situation may be such that the court can say as a matter of law

22   whether a certain thing required was or was not done within a reasonable time."). However, because

23   it is not clear that pre-suit notice is an absolute requirement under Washington law, plaintiff may

24   amend his complaint to show why it was not unreasonable to delay giving Apple notice of his intent

25   to assert a warranty claim until December 5, 2011.

26              **c.        Warranty claims under federal law**

27              The notice requirement applies with equal force to claims brought under the MMWA. *See*

28   *Birdsong v. Apple, Inc.*, 590 F.3d 955, 958 n.2 (9th Cir. 2009) (MMWA claims are analyzed under

1   state warranty law); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008)

2   ("Disposition of the state law warranty claims determines the disposition of the Magnusson-Moss

3   Act claims.").  Because the court dismisses plaintiff's state warranty claims, his MMWA claim is

4   dismissed as well.  Plaintiff may amend the federal claim to the extent that it is based on a violation

5   of Washington law.

6   **F.      Contract Claims**

7        **1.      Breach of express contract**

8           In order to state a claim for breach of contract, a plaintiff must plead the existence of a

9   contract, his performance of the contract or excuse for nonperformance, the defendant's breach and

10  resulting damages.  *Otworth v. Southern Pac. Transportation Co.*, 166 Cal. App. 3d 452, 458 (Cal.

11  Ct. App. 1985).  A contract may be written, oral or implied by conduct.  *Id*; *see also Multicare*

12  *Medical Ctr. v. Dep't of Soc. & Health Servs.*, 790 P.2d 124, 137 (Wash. 1990) (intention to contract

13  may be manifested by conduct or words) (citing Restatement (Second) of Contracts § 18 (1979)).

14  The complaint must identify the specific provision of the contract allegedly breached by the

15  defendant.  *See Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 281 (Cal. Ct.

16  App. 2005).

17          Here, plaintiff alleges that "the contract for the purchase of the iPhone[] included a promise

18  to provide a working signal meter."  FAC ¶ 89.  Plaintiff claims that such a promise is implied by the

19  facts that: (1) the User Guide indicates "that the signal meter … can be properly used to trace

20  whether the user is within sufficient range of the cellular network;" and (2) the sample iPhone on

21  display at the Apple retail store and the actual phone plaintiff purchased appeared to contain

22  working signal meters.  *See* FAC ¶ 87, 51.  Plaintiff asserts that Apple's failure to provide him with a

23  properly functioning signal meter thus breached an express term of the parties' sales contract.  *Id.* ¶

24  88.

25          Apple argues that the User Guide is merely an instruction manual, and therefore does not

26  give rise contractual obligations.  The court agrees.  A review of the User Guide shows that it

27  provides directions for using an iPhone and descriptions of the device's functions, but includes no

28  "promises" which plaintiff could have "accepted."  *See* Dkt. No. 34-1, Ex. A; *Donovan v. Rrl Corp.*,

1    26 Cal. 4th 261, 271 (Cal. 2001) (contract formation requires an "offer communicated to the offeree

2    and an acceptance communicated to the offeror.").  Plaintiff does not even allege that he saw the

3    User Guide before purchasing his iPhone, further undermining his claim that he accepted its terms as

4    part of a contract of sale.  *Compare Stomp, Inc. v. Neato*, 61 F. Supp. 2d 1074, 1081 n. 11 (C.D. Cal.

5    1999) ("shrinkwrap agreements" placed inside the cellophane packaging of computer software boxes

6    may be enforceable because "*by their terms*, [they] become effective once the "shrinkwrap" is

7    opened") (emphasis added).  Nor does the User Guide reasonably suggest that Apple intended to be

8    "bound" by its provisions, which include wide-ranging instructions on topics like "sending voice

9    memos" and "adding calendar events."  *See Alexander v. Codemasters Group Ltd.*, 104 Cal. App. 4th

10   129, 141(Cal. Ct. App. 2002) ("[M]utual consent is determined under an objective standard applied

11   to outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words

12   and acts . . . .").  On these facts, adopting the position that an instructional manual is a contract

13   would vastly expand the scope of a manufacturer's express and implied warranties, creating a

14   perverse incentive for manufacturers to avoid including comprehensive manuals with their products.

15        Plaintiff's cited authorities—in addition to being non-binding on this court—are factually

16   distinguishable from the case at hand.  For example, in *Kaiser-Flores v. Lowe's Home Ctrs., Inc.*,

17   No. 08-45-V, 2009 U.S. Dist. LEXIS 28300 (W.D.N.C. Mar. 19, 2009), the court accepted as true

18   the plaintiff's allegation that safety warnings included in an instruction manual were incorporated

19   into the defendant's obligation to install a dryer "in a manner consistent with the manufacturer's

20   requirements."  *Id.* at 16.  By contrast, plaintiff has not alleged that the defective signal meter raised

21   safety concerns or that the User Guide provided any "warnings" with which Apple failed to comply.

22   Similarly, *Peoples Gas System, Inc. v. RSH Constructors, Inc.*, 563 So. 2d 107, 110 (Fla. Ct. App.

23   1990) is inapposite because it concerned whether *explicitly contractual language* in a separately-

24   executed "project manual" was incorporated into the parties' written construction contract.

25        The court also finds unpersuasive plaintiff's contention that because the User Guide expressly

26   disclaims liability for the performance of third-party applications, Apple implicitly accepted liability

27   for any defect in the performance of its own technology.  *See* Dkt. No. 34-1, Ex. A at 217.  Simply

28

United States District Court
For the Northern District of California

1    put, limiting liability for certain defects does not automatically render a manufacturer liable for all

2    other defects.

3          Plaintiff's other argument—that the ostensibly functioning iPhone on display at the Apple

4    store establishes the existence of a contract—is not supported by any authority at all.  As noted

5    above, plaintiff has not explained what the display iPhone depicted, why he believed it to be

6    properly functioning, or what, if any, written or oral representations accompanying the display

7    conveyed the impression that the signal meter in the iPhone he purchased would be "accurate."

8    Without more detail, the court cannot conclude that the presence of a product at a retail store that

9    "appears" to function in a certain way gives rise to an express contractual obligation to deliver a

10   product that conforms with a buyer's unstated expectations.

11         Accordingly, the court concludes that Apple did not breach an express term of its contract

12   with plaintiff by failing to provide him with an iPhone containing a working signal meter.  However,

13   because plaintiff may be able to allege facts showing the existence and breach of such an obligation,

14   the court dismisses plaintiff's breach of contract claim with leave to amend.

15         **2.      Breach of implied covenant of good faith and fair dealing**

16         "Every contract contains an implied covenant of good faith and fair dealing that neither party

17   will do anything which will injure the right of the other to receive the benefits of the agreement."

18   *Wolf v. Walt Disney Pictures and Television*, 162 Cal. App. 4th 1107, 1120 (Cal. Ct. App. 2008).

19   "The covenant is implied . . . to prevent a contracting party from engaging in conduct which (while

20   not technically transgressing the express covenant) frustrates the other party's rights of the benefits

21   of the contract."  *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938 (9th Cir. 1999) (quoting *Los*

22   *Angeles Equestrian Ctr., Inc. v. City of Los Angeles*, 17 Cal. App. 4th 432, 447 (Cal. Ct. App.

23   1993)).  A "breach of a specific provision of the contract is not a necessary prerequisite" to a breach

24   of an implied covenant of good faith and fair dealing.  *Carma Developers (Cal.), Inc. v. Marathon*

25   *Development California, Inc.*, 2 Cal. 4th 342, 373 (Cal. 1992).  However, the implied covenant is

26   "limited to assuring compliance with the express terms of the contract, and cannot be extended to

27   create obligations not contemplated by the contract."  *Pasadena Live, LLC v. City of Pasadena*, 114

28   Cal. App. 4th 1089, 1094 (Cal. Ct. App. 2004) (internal citation omitted).

ORDER GRANTING MOTION TO DISMISS
No. 11-cv-05337 RMW
EDM

1    Plaintiff's breach of the implied covenant claim is premised solely on the argument that the

2    User Guide created an express obligation to provide him with a working signal meter.  *See* Dkt. No.

3    40 at 19.  As the court has rejected this argument in dismissing plaintiff's contract claim, plaintiff's

4    breach of the implied covenant claim is also dismissed with leave to amend.

5    **G.    Restitution Claim**

6        Under California law, restitution and unjust enrichment are generally thought of not as

7    causes of action, but "general principle[s] underlying various legal doctrines and remedies."

8    *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (Cal. Ct. App. 2004) (internal citation omitted);

9    *but see Nordberg*, 445 F. Supp. 2d at 1100 (noting that some California courts recognize restitution

10   or unjust enrichment claims).  Restitution may be available where the defendant "obtained a benefit

11   from the plaintiff by fraud, duress, conversion, or similar conduct."  *McBride*, 123 Cal. App. 4th at

12   388.  Restitution and unjust enrichment are a stand-alone causes of action under Washington law,

13   but their analytical underpinnings are essentially the same as in California.  *See Young v. Young*, 164

14   Wn.2d 477, 484 (Wash. 2008) ("Unjust enrichment is the method of recovery for the value of the

15   benefit retained absent any contractual relationship because notions of fairness and justice require

16   it.").

17       Here, plaintiff indicates that his restitution claim is based on Apple's alleged fraud, and is

18   pleaded in the alternative to his breach of contract claims.  The court agrees that if plaintiff prevails

19   on his consumer protection claims but not under a contract theory, he may seek recovery in the form

20   of restitution.  *See, e.g.*, *Nordberg*, 445 F. Supp. 2d at 1101 n.15 ("The California Unfair

21   Competition Law is equitable in nature and plaintiffs that prevail under the UCL are 'generally

22   limited to injunctive relief and restitution.') (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29

23   Cal. 4th 1134, 1144 (Cal. 2003)).  However, as plaintiff has failed to sufficiently plead an actionable

24   misrepresentation or omission, his restitution claim must be dismissed.  *See Meaunrit v. Pinnacle

25   Foods Group, LLC*, No. 09-04555 CW, 2010 U.S. Dist. LEXIS 43858, at *36 (N.D. Cal. 2010)

26   ("Plaintiffs' unjust enrichment and restitution claim fails because they have not stated a predicate

27   claim warranting such relief.").  If plaintiff chooses to amend his complaint, he may reassert a claim

28

1   for restitution under Washington law, and include a request for restitution in his prayer for relief

2   pursuant to California law.

3

4

5                                       **III. ORDER**

6           For the foregoing reasons, the court grants Apple's motion to dismiss plaintiff's claims for

7   breach of contract, breach of the implied covenant of good faith and fair dealing, breach of warranty

8   under Washington law and the MMWA, violation of Cal. Bus. & Prof. Code § 17200, violation of

9   the CLRA, violation of the WCPA, and restitution under Washington law with leave to amend.  Any

10  amended pleading must be filed within thirty days of the date of this order.  Plaintiff's claims for

11  breach of implied and express warranty under California law are dismissed with prejudice.

12

13

14  DATED:          May 10, 2012                          _Ronald M. Whyte_

15                                                        RONALD M. WHYTE
                                                          United States District Judge
16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California